IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

MAURCY QUINONES                                                                                    PLAINTIFF

vs.                                    Civil No. 2:20-cv-02171-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,[1]
Social Security Administration                                                                    DEFENDANT

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Maurcy Quinones ("Quinones"), brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claims for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382(a)(3)(A).  In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision.  42 U.S.C. § 405(g).

**I.     Procedural Background**

Quinones filed her applications for benefits on April 30, 2018, and April 15, 2019, alleging an onset date of December 15, 2015, due to bipolar disorder, anxiety, panic attacks, and depression. (ECF No. 14-2, p. 11; ECF No. 14-3, pp. 4-5, 14-15).  She was 37 years old on the alleged onset date.  (ECF No. 14-2, p. 21).  She has past relevant work ("PRW") as a poultry dresser.  (*Id.*).

The Commissioner denied her applications initially and on reconsideration.  (ECF No. 14-4, pp. 6-8, 10-11).  At Plaintiff's request (*Id.*, pp. 12-13), an Administrative Law Judge ("ALJ"),

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

1

the Hon. Elisabeth McGee, held an administrative hearing on July 10, 2019. (ECF No. 14-2, pp. 29-71). Plaintiff was present and represented by counsel.

On December 5, 2019, the ALJ found that Quinones had the following severe impairments: grade 3 separation of the left shoulder, bipolar disorder/depression, and panic disorder/anxiety. (ECF No. 14-2, p. 14). The ALJ concluded that her impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*, p. 15). The ALJ determined that Quinones retained the residual functional capacity ("RFC") to do the following:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant is able to perform unskilled work with occasional interaction with supervisors and co-workers but no interaction with the public other than incidental contact. (*Id.*, p. 16).

With the assistance of a vocational expert ("VE"), the ALJ found that Quinones could perform work as a cleaner/housekeeping and assembler production. (ECF No. 14-2, p. 22). She concluded Quinones had not been under a disability as defined by the Act from December 15, 2015, through the date of the ALJ's decision on December 5, 2019. (*Id.*).

The Appeals Council denied Plaintiff's request for review on July 28, 2020. (ECF No. 14-2, pp. 2-5). She subsequently filed this action on September 25, 2020. (ECF No. 1). This matter is before the undersigned for report and recommendation. Both parties have filed appeal briefs (ECF Nos. 17, 20), and the case is now ready for decision.

## II.     Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We

must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months. The disability determination process is not an adversarial process; instead, the Commissioner's duty exists alongside the claimant's burden to prove her case. *See Noerper v. Saul*, 964 F.3d 738 (8th Cir. 2020).

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an

impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The fact finder only considers Plaintiff's age, education, and work experience in the light of her residual functional capacity if the final stage of the analysis is reached. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

### III.  Relevant Medical Evidence

Quinones was admitted to Sequoyah Memorial Hospital on November 10, 2015, with weakness in her right hand because of a cat bite she received on October 26, 2015. (ECF No. 14-7, pp. 70-71). She stated she did not get her antibiotic filled and, as a result, was having difficulty lifting objects with her right hand. (*Id*.). She had full range of motion in her right hand, but decreased range with full extension of her right wrist. (*Id*.). John Marlar, DO, found Quinones resting on the bed and in no distress, and her mood and affect were normal. (*Id*.). Dr. Marlar started Quinones on the rabies vaccine series and ordered her to follow up with Melissa Horn. (*Id*.).

Quinones presented to Redbird Primary Care on November 30, 2015, for a follow up appointment. (ECF No. 14-7, pp. 5-6). She reported being out of medications for her bipolar disorder and claimed her anxiety and depression had worsened. (*Id*., p. 5). She complained of depression, anxiety, and insomnia, but no psychosis. (*Id*.). Melissa Horn, APRN, assessed chronic anxiety, bipolar disorder, initial insomnia, and vitamin D deficiency. (*Id*., pp. 5-6). APRN Horn prescribed Clonazepam, Fluoxetine (Prozac), Ziprasidone, Metronidazole, Zolpidem at bedtime as needed, Ergocalciferol once a week, and Cyclobenzaprine three times a day as needed. (*Id*., p. 6).

On June 2, 2016, Quinones requested a change to her medications and complained of left sided chest pain. (ECF No. 14-7, pp. 3-4). She denied depression and psychosis, but she stated she had total body anxiety and tingling in the chest. (*Id.*, p. 3). APRN Horn assessed chest wall pain, bipolar affective disorder - current episode manic, and chronic anxiety. (*Id.*). Lyrica was prescribed. (*Id.*).

On July 29, 2016, Quinones presented for a clinical breast exam and to discuss her medication. (ECF No. 14-7, p. 28). She reported the Lyrica was helping with her anxiety and that she was not taking Klonopin (Clonazepam) as often because she did not need it. (*Id.*). However, she complained of trouble sleeping and that she stays awake at night cleaning. (*Id.*). She was anxious, although she appeared healthy, well groomed, and much more relaxed than previous visits. (*Id.*). Because of her anxiety and chronic back pain, she asked if her medication could be increased. (*Id.*). APRN Horn increased the Lyrica to 100 mg twice a day. (*Id.*).

One month later, Quinones was seen on August 29, 2016, by Robert Tracy Files, PA, complaining of pain in her left breast and on her left side. (ECF No. 14-7, p. 26). She admitted to being anxious and stated that her Lyrica prescription was written wrong. (*Id.*). After looking back at the notes, PA Files confirmed that the prescription was written incorrectly and that it should have been two pills twice a day for 120 per month. (*Id.*). Quinones was assessed with breast pain and bipolar affective disorder, current episode manic. (*Id.*, pp. 26-27). Tramadol and Lyrica were prescribed. (*Id.*). According to the treatment notes, Quinones asked several times for continuing pain medications such as Percocet. (*Id.*, p. 27). PA Files prescribed Tramadol for a short time and Lyrica was rewritten as prescribed in the note by her primary care physician. (*Id.*). Quinones was instructed to follow up with her primary care physician for any other pain medication. (*Id.*).

On November 1, 2016, Quinones sought care after falling and landing on her right hand. (ECF No. 14-7, p. 24). She had a normal grip and minor swelling to the dorsal aspect of the metacarpal, but otherwise she was in no distress and euthymic. (*Id*.). PA Files assessed a sprained wrist and prescribed Ketorolac. (*Id*.).

Quinones returned to Redbird Primary Care on February 15, 2017, to discuss a lump in her left breast and to see a hand surgeon. (ECF No. 14-7, p. 21). She reported that since her fall in November 2016, she continued to experience pain and a growing lesion on top of the wrist. (*Id*.). She also stated that she continued to have panic attacks and requested a refill of her Clonazepam. (*Id*.). A physical exam revealed normal findings, she was cooperative, and in no distress. (*Id*.). APRN Horn assessed a ganglion cyst of the right dorsal wrist and referred her to a surgery clinic. (*Id*.). APRN Horn also assessed Quinones as having severe bipolar disorder, refilled her Lyrica, and administered a flu vaccination shot. (*Id*.).

On May 26, 2017, Quinones returned to clinic with complaints of swollen feet, dizziness, shakiness, and history of thirst all the time. (ECF No. 14-7, p. 18). She also wanted to be evaluated for diabetes and revealed that she has a strong history of diabetes. (*Id*.). PA Files noted difficulty in understanding Quinones as she had a slurred speech, and her eyes were closed. (*Id*.). Quinones said this was due to having taken Clonazepam and Lyrica prior to coming to the clinic. (*Id*.). According to the treatment notes, Quinones was alert but rarely opened her eyes while speaking. (*Id*.). Her A1c was within normal limits. (*Id*.). She was assessed with increased thirst and family history of diabetes mellitus type 2. (*Id*., p. 19).

Quinones went to Sequoyah Memorial Hospital on June 20, 2017, with shoulder pain after falling. (ECF No. 14-7, p. 63). Her pain was sharp, and she requested something for anxiety. (*Id*.). She was well-developed, well-nourished, and anxious appearing but in no distress. (*Id*., pp.

64-65). Her affect was normal, as was her thought content and process. (*Id*., p. 65). Andrew Ryals, DO, assessed an acromioclavicular joint separation, and he advised Quinones to wear a shoulder immobilizer until she could see an orthopedic surgeon. (*Id*.).

Quinones returned to the Sequoyah Memorial Hospital emergency room on August 8, 2017, with complaints of anxiety, shortness of breath, and bilateral chest pain. (ECF No. 14-7, p. 49). She reported being out of her medications for one week. (*Id*.). She stated the pain did not radiate and came on with her panic attack. (*Id*.). She was anxious but cooperative; manifested a normal affect; and was oriented to person, place, time, and situation. (*Id*.). Genevieve Dulan, M.D., assessed Quinones with anxiety and methamphetamine abuse. (*Id*., pp. 53-54). Dr. Dulan prescribed Benadryl, Tylenol, and Prozac. (*Id*., p. 54). Quinones was discharged home and encouraged to stop methamphetamine use. (*Id*.).

On September 18, 2017, Quinones returned to Redbird Primary Care claiming she ran out of her medications. (ECF No. 14-7, pp. 119-20). She reported having problems with panic attacks, depression, manic episodes, and insomnia. (*Id*., p. 119). She said the highest dose of Prozac didn't help control her depression. (*Id*.). Although she had no suicidal or homicidal thoughts, she did report sadness. (*Id*.). She missed her mammogram appointment and needed to reschedule an appointment secondary to continued breast pain. (*Id*.). APRN Horn found Plaintiff alert, cooperative, and in no distress. (*Id*.). He assessed Quinones with manic bipolar disorder and explained the importance of taking medication regularly. (*Id*.). He prescribed Duloxetine, Haloperidol for insomnia, Lyrica, Ziprasidone, and Clonazepam. (*Id*., pp. 119-20). APRN Horn refused to increase Clonazepam, but prescribed Ergocalciferol for Plaintiff's Vitamin D deficiency. (*Id*.).

On March 5, 2018, Plaintiff presented to Redbird Behavioral Health for a scheduled intake and assessment appointment with Mika Goff, CADC. (ECF No. 14-7, pp. 107-08). Quinones arrived with her mother and requested that her mother attend the session. (*Id.*, p. 107). She was groomed and dressed casually; made good eye contact that was clear and focused; however, she became teary eyed two to three times. (*Id.*). Her speech was clear, and her thoughts were organized. (*Id.*). She interacted and participated well. (*Id.*). She reported heavy drinking due to anxiety, and that she recently lost her job due to her anxiety and drinking. (*Id.*). She also stated that anxiety and alcohol had been the ultimate cause of her failed marriage, as well as the loss of her two children. (*Id.*). Ms. Goff noted that Quinones had never been treated in an inpatient setting for alcohol problems. (*Id.*). Quinones agreed to look at a dual diagnosis inpatient treatment center to address the alcohol and mental health problems. (*Id.*).

Three weeks later, on March 26, 2017, Quinones returned to Redbird Primary Care to discuss medications and bloodwork. (ECF No. 14-7, pp. 103-05). Plaintiff stated her bipolar disorder was poorly controlled and acknowledged her history of panic attacks and anxiety. (*Id.*, p. 103). According to Caysie Noelle Garza, APRN, Quinones complained of constant diaphoresis[2] and that she is always drenched. (*Id.*). She experienced nausea, shaking hands, and exhaustion. (*Id.*). Quinones stated she had lost numerous jobs due to her bipolar disorder and anxiety. (*Id.*). She said she cannot care for her children, has struggled with bipolar disorder, and struggled with anxiety for many years. (*Id.*). Upon physical exam, she was alert, oriented, well nourished, and in no acute distress. (*Id.*). APRN Garza assessed Quinones with bipolar affective disorder, current

---

[2] Diaphoresis is the medical term used to describe excessive, abnormal sweating in relation to your environment and activity level. It tends to affect your entire body rather than a part of your body. This condition is also sometimes called secondary hyperhidrosis. *See* Understanding Diaphoresis, at https://www.healthline.com/health/diaphoresis (last accessed Dec. 9, 2021).

episode manic, and panic disorder without agoraphobia. (*Id.*, p. 104). She noted that she would consult with behavioral health regarding any changes to psych medications. (*Id.*).

On May 16, 2018, Quinones returned to see Ms. Goff at Redbird Behavioral Health. (ECF No. 14-7, pp. 101-02). She was anxious, shaky, and had what looked like hives on the back of her right arm. (*Id.*, p. 101). She was also teary and complained of feeling bad. (*Id.*). Quinones reported that her primary doctor had taken her off all her anxiety and sleep medications and left her with two medications which were not helping. (*Id.*). She complained of shaking, nervousness, and drinking to relieve it, but stated that her last drink was two nights before. (*Id.*). Ms. Goff discussed the possibility of going inpatient to Parkside Hospital to aid with medications as Plaintiff admitted feeling like giving up and wished she did not have to be there. (*Id.*). She denied that she would harm herself but voiced concern with these thoughts. (*Id.*). Quinones still lived with her mother who was helping her, and ultimately, she agreed to dual diagnosis and alcohol treatment. (*Id.*).

Quinones returned to see Ms. Goff on August 16, 2018. (ECF No. 14-7, pp. 99-100). She was alert and oriented; was well groomed and dressed; made good eye contact which was clear and focused; and her speech was fluent and clear. (*Id.*, p. 99). Although her thoughts were organized, Ms. Goff opined that Quinones was medically paranoid. (*Id.*). Quinones reported being sober for three months, while spending two months in jail. (*Id.*). She had been donating blood to aid with financial expenses, however, since donating blood she felt sluggish, tired, and more anxious. (*Id.*). Quinones did not get overly upset and cry as she had in the past, and she was observed to be calm and pleasant. (*Id.*). She stated she was doing pretty good, but she said she had been down for the past week and was getting her depression back. (*Id.*).

On September 21, 2018, Quinones presented to the Guidance Center for an initial assessment with Diana Ajtun, LPC. (ECF No. 14-7, pp. 156-65). Quinones reported having depression symptoms since age 15. (*Id*., p. 156). She further explained that this is when she had her first panic attack. (*Id*.). She was noted to be irritable and agitated. (*Id*., p. 157). Her insight, judgment into illness, and life situation were unimpaired, but her mood and affect were sad and tearful. (*Id*.). A mental status exam revealed some normal signs, but she did have suicidal ideation. (*Id*.). Ms. Ajtun diagnosed panic disorder, major depressive disorder, personal history of psychological abuse in childhood, and personal history of sexual abuse in childhood. (*Id*., pp. 161-165).

Quinones was seen by Colleen Atchley, APRN, on October 10, 2018, at the Guidance Center for her bipolar disorder and anxiety. (ECF No. 14-7, pp. 150-55). She stated, "I need help with my [b]ipolar and anxiety. I am tired of being sick." (*Id*., p. 150). She reported being depressed for three months and having constant anxiety. (*Id*.). Most recently, she was prescribed Clonazepam, Ziprasidone, and Duloxetine, however, she admitted to not taking any of the medicine as prescribed. (*Id*.). Her psychiatric history included Redbird Clinic outpatient for eight years, and she reported having severe anxiety and panic attacks since age 14. (*Id*.). She reported having been hospitalized once in Little Rock for a suicide attempt and having been hospitalized in Fayetteville for an accidental overdose. (*Id*.). Nurse Atchley assessed bipolar disorder, current episode depressed, moderate; panic disorder; alcohol use disorder, moderate; major depressive disorder, recurrent episode, moderate; personal history of psychological abuse in childhood; and personal history of sexual abuse in childhood. (*Id*., pp. 152-53). A mental status exam was mostly normal, but her mood was anxious. (*Id*., p. 153). Nurse Atchley started Quinones on an initial trial of Gabapentin for mood swings and to promote sobriety. (*Id*., p. 154). Ziprasidone was

continued for now, but it was noted that Quinones was unable to tolerate a daytime dose. (*Id*.). Nurse Atchley prescribed Latuda for mornings and contemplated switching Ziprasidone to Latuda in the future. (*Id*.). Quinones was also prescribed Hydroxyzine for anxiety, and she was advised to avoid benzodiazepines due to alcohol use disorder and inappropriate use in the past. (*Id*.). Additionally, she was ordered to discontinue taking anti-depressants for the time being. (*Id*.).

On January 4, 2019, Quinones returned to the Guidance Center complaining of panic attacks and poor sleep. (ECF No. 14-7, p. 146). She said the Latuda was helping a lot and confirmed improved productivity overall. (*Id*.). On the other hand, she reported poor sleep and low energy. (*Id*.). She reported having good days and bad days in terms of depressive symptoms, with more bad days than good days. (*Id*.). She said she was unable to completely discontinue Ziprasidone due to increased symptoms, but she did not want to increase it either. (*Id*.). Suicidal ideation was denied. (*Id*.). Quinones reported difficulty in scheduling follow-up appointments and a reduction of panic attacks to two to three per week. (*Id*.). She felt the hydroxyzine took the edge off her feelings of anxiety. (*Id*.). Nurse Atchley noted that Quinones frequently missed counseling appointments and related it to feeling bad. (*Id*.). Quinones reported being sober about a month and a half. (*Id*.). Her mental status exam was mostly normal, but she exhibited poor eye contact, impaired judgment, and poor insight. (*Id*., pp. 146-47). Nurse Atchley again assessed bipolar disorder, current episode depressed, moderate; panic disorder; alcohol use disorder, moderate; major depressive disorder, recurrent episode, moderate; personal history of psychological abuse in childhood; and personal history of sexual abuse in childhood. (*Id*., pp. 147-48). Nurse Atchley increased the dosage of Gabapentin for anxiety and sobriety, added Mirtazapine for anxiety and depression, and cautioned about potential activation. (*Id*., p. 148).

On March 27, 2019, Quinones returned to the Guidance Center for a follow-up appointment and to discuss increased irritability. (ECF No. 14-7, p. 142). She discontinued taking Remeron (Mirtazapine) due to weight gain, fatigue, and a zombie feeling. (*Id*.). A counselor suggested she may have some post-traumatic stress disorder from past experiences. (*Id*.). Latuda reportedly increased her irritability but helped with her mood and decreased energy. (*Id*.). In addition, she stated the Vistaril (Hydroxyzine) helped. (*Id*.). Nurse Atchley noted medication compliance had not been ideal as Quinones lost her insurance coverage. (*Id*.). Quinones said she lays down most of the day and typically stays at the house. (*Id*.). She further stated she feels like she is never rested and has no initiative. (*Id*.). She reported being happy when her children are around her. (*Id*.). A mental status exam was mostly normal, but her mood was irritable, her affect was somewhat dramatic, and her judgment was impaired. (*Id*., p. 143). Quinones' diagnoses remained unchanged from her previous visit. (*Id*., pp. 143-44). Nurse Atchley discussed the importance of not running out of medications, and she referred Quinones to the Geona and Vraylar patient assistance programs since she lost her insurance. (*Id*., pp. 144-45). Nurse Atchley discontinued the prescription for Mirtazapine due to reported side effects, ordered a change from Latuda to 1.5 mg of Vraylar for three weeks, and instructed Quinones to increase her Vraylar dosage to 3 mg daily after three weeks. (*Id*., p. 145). Nurse Atchley added Seroquel to help with anxiety and insomnia and added Zoloft for depression and anxiety. (*Id*.).

On April 16, 2019, Quinones returned to the Guidance Center and reported feeling a lot better. (ECF No. 14-7, p. 138). She exhibited an improved mood and a reduction of anxiety. (*Id*.). Nurse Atchley also noted Quinones continues to take 1.5 mg of Vraylar. (*Id*.). Quinones expressed concern that the good feelings would not last or that she would become manic. (*Id*.). According to Quinones, it took one to two weeks to notice the improvement, and she reported being happy

and no longer irritable towards her mother for no reason. (*Id*.). She also reported improved motivation, sleep, energy, hygiene, and outlook. (*Id*.). Moreover, she had abstained from drinking for about four months, reported exercising, and attending church. (*Id*.). A mental status exam was normal. (*Id*., pp. 138-39). Nurse Atchley assessed bipolar disorder in partial remission, most recent episode depressed; panic disorder; alcohol use disorder, moderate; major depressive disorder, recurrent episode, moderate; personal history of psychological abuse in childhood; and personal history of sexual abuse in childhood. (*Id*., pp. 139-40). No changes were made to Quinones' prescriptions, and it was specifically noted that Quinones would remain on Vraylar 1.5 mg due to improvement rather than increase to 3 mg as previously planned. (*Id*., p. 141).

## IV.  Discussion

Quinones raises the following issues on appeal: (1) whether the ALJ erred in failing to fully and fairly develop the record, and (2) whether the ALJ erred in her RFC determination. (ECF No. 17, pp. 7-16). After thoroughly reviewing the record, the undersigned finds that the ALJ failed to fully and fairly develop the record, and therefore, it does not provide substantial evidence to support the ALJ's RFC finding. Because this failure already necessitates reversal and remand, it is not necessary to address Quinones' remaining argument.

### Development of the Record

In determining whether the ALJ has fully and fairly developed the record, the proper inquiry is whether the record contained sufficient evidence for the ALJ to make an informed decision. *Haley v. Massanari,* 258 F.3d 742, 749-50 (8th Cir. 2001). "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir. 1998)). Moreover, "[a]n ALJ's failure to cite specific evidence does not

indicate that such evidence was not considered." (*Id*.). While "[a]n ALJ should recontact a treating or consulting physician if a critical issue is undeveloped," "the ALJ is required to order medical examinations and tests only if the medical records presented to [her] do not give sufficient medical evidence to determine whether the claimant is disabled." *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010) (quotation, alteration, and citation omitted).

Here, at both the initial and reconsideration levels, the non-examining state agency medical consultants opined there was insufficient evidence pertaining to their evaluation of Quinones' claims, so they did not conduct physical or mental RFC assessments. (ECF No. 14-3, pp. 4-22). As the Commissioner points out, Quinones' DIB claim was filed on April 30, 2018, and her SSI claim was filed on April 15, 2019. (ECF No. 14-2, p. 11; ECF No. 14-3, pp. 4-5, 14-15; ECF No. 20, p. 7). Consequently, the non-examining state agency consultants only considered evidence from Quinones' alleged onset date of December 15, 2015, through her date last insured on June 30, 2016. (ECF No. 14-3, pp. 2-22). However, the ALJ evaluated Quinones' concurrent claims, including SSI for which the relevant period extended through December 5, 2019, the date of the ALJ's decision. (ECF No. 14-2, pp. 11-22). Ultimately, the ALJ found the opinions of the non-examining state agency consultants unpersuasive based on Nurse Atchley's mental health treatment notes. (*Id*., p. 21).

Quinones did report symptom improvement and a reduction in anxiety to Nurse Atchley on April 16, 2019. (ECF No. 14-7, pp. 138-39). However, just weeks before, on March 27, 2019, Quinones reported she just lays down most of the day, feels as if she is never rested, and has no initiative. (*Id*., p. 142). She even discontinued a prescribed medication due to side effects, was prescribed Vraylar to replace her Latuda medication, and was prescribed two additional medications (Seroquel and Zoloft) for her anxiety, depression, and insomnia. (*Id*., pp. 142-45).

The evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment. *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). Evidence of symptom-free periods, which may negate the finding of a physical disability, do not compel a finding that disability based on a mental disorder has ceased. (*Id.*). Mental illness can be extremely difficult to predict, and remissions are often of "uncertain duration and marked by the impending possibility of relapse." (*Id.*). This is underscored by Quinones' stated fear that feeling good would not last or that she would become manic. (ECF No. 14-7, p. 138). Further, individuals suffering from mental disorders often have their lives structured to minimize stress and help control their symptoms, indicating that they may actually be more impaired than their symptoms indicate. *See Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001); *see also Maestri v. Colvin*, No. 2:15-CV-2125-PKH-MEF, 2016 WL 4523890, at *3 (W.D. Ark. Aug. 8, 2016), report and recommendation adopted, No. 2:15-CV-2125, 2016 WL 4523899 (W.D. Ark. Aug. 29, 2016).

While it is true that none of Quinones' treating sources offered an opinion regarding her physical restrictions and mental restrictions, it is equally true that the ALJ did not ask any of Quinones' physicians or treating sources to complete RFC assessments, despite the substantial evidence of Plaintiff's severe impairments of bipolar disorder/depression and panic disorder/anxiety. The record is replete with evidence concerning Quinones' severe mental impairments and instances when she necessitated both medication changes and dosage adjustments. Nor did the ALJ order a consultative examination to assist in determining Quinones' work restrictions. "It is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for [her] to make an informed decision." *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985) (quoting *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir.1984)).

15

Moreover, at the administrative hearing, the ALJ and Quinones' counsel engaged in a discussion regarding the absence of opinion evidence and the need for a consultative examination. (ECF No. 14-2, pp. 68-71). The ALJ stated the following:

> Well and I expressed my frustration because, where I worked previously, when they expedited, we got completed forms, and I was surprised when the Title 16 came in with nothing, and in fact talked with the staffer about that and they said, this is what happens up here. So I didn't realize that. (*Id.*, p. 69).

The ALJ further added, "[s]o I had anticipated at least getting something from DDS on that. So did you want a psych, did you want a physical?" (*Id.*). Quinones' counsel, referring to her brief before the ALJ, confirmed that she had requested both physical and mental consultative exams unless a fully favorable or partially favorable decision could be made. (*Id.*).

We agree that a remand is warranted as the ALJ did not fully and fairly develop the record. On remand, the ALJ is directed to order a psychiatric/psychological consultative examination, to include a detailed RFC assessment of Quinones' mental limitations. Additionally, the ALJ is directed to re-contact Quinones' treatment providers, including Nurse Horn, Nurse Garza, Nurse Atchley, and the counselor, Ms. Atjun, to request updated reports regarding Quinones' mental impairments and an RFC assessment of her mental limitations. With this additional information, the ALJ should reassess Quinones' RFC, considering all of her impairments, and conduct a thorough sequential evaluation analysis.

## V. Conclusion

For the reasons stated above, it is recommended that the Commissioner's decision denying benefits be reversed and remanded for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely**

**objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 15th day of December 2021.

/s/ Mark E. Ford
HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE